UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| TRAFFIC SAFETY DEVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:  3:02-CV-636 |
| | ) | (VARLAN/SHIRLEY) |
| SAFETY BARRIERS, INC., and | ) | |
| C. REED DAVIS, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This civil action between plaintiff Traffic Safety Devices, Inc. ("Traffic Safety") and defendants Safety Barriers, Inc. ("Safety Barriers") and C. Reed Davis is before the Court following a four-day bench trial occurring between November 7 and 16, 2005. The parties waived their right to a jury trial [*see* Doc. 137]. Traffic Safety called five witnesses in support of its claims of breach of contract and fraud and in opposition to Safety Barriers' counterclaim: David Wasserstrom, the President of Traffic Safety; Ron Tourte and James Barillaro, former employees of Safety Barriers; and the testimony by deposition of Brian Brough and David Little, employees of Rotational Molding of Utah. Safety Barriers and Mr. Davis cross-examined these witnesses and called four witnesses in support of their defenses and counterclaim for breach of contract: Mark McKinney, Maxine O'Domirok, and Robert Patterson, all former employees of Safety Barriers; and defendant C. Reed Davis, Executive Vice President of Safety Barriers.

Following the trial, the parties filed proposed findings of fact and conclusions of law [Docs. 159, 160]. After consideration of all the evidence presented at trial [Docs. 148, 149, 150, 151][1] and the parties' post-trial pleadings, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I.    Findings of Fact

### A.    The Parties

1.    Plaintiff Traffic Safety Devices, Inc. is a Delaware corporation located in Elkins Park, Pennsylvania, that owns patents and molds for manufacturing polyethylene plastic highway barriers known as Roadguard barriers.[2] The Roadguard barriers are manufactured by Rotational Molding of Utah, located in Brigham City, Utah. David Wasserstrom is the president of Traffic Safety.

2.    Mr. Wasserstrom is a lawyer with an advanced law degree in taxation. Mr. Wasserstrom was formerly licensed to practice law in the District of Columbia and the Commonwealth of Pennsylvania.

3.    In approximately 1996, Mr. Wasserstrom pled guilty to two felony counts in the United States District Court for the Eastern District of Pennsylvania for conspiracy to

---

[1]The trial transcript consists of four volumes contained in the record as Docs. 148-151 and will be cited as "Tr. at _____." Both parties introduced numerous exhibits which will be identified as "Pl. Ex.____" or "Def. Ex. ____."

[2]The plastic barriers at issue are relatively light and portable. They may be filled with water, sand, pea gravel, or left unfilled and may be used for traffic control in highway work zones.

commit wire fraud and evasion of currency reporting requirements which occurred in the course of his law practice. Mr. Wasserstrom was sentenced to fifteen (15) months imprisonment and served eleven (11) months at a federal prison camp in Schuylkill, Pennsylvania. As a result of this conviction, Mr. Wasserstrom is no longer a licensed attorney.

4.      Defendant Safety Barriers, Inc. is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. Karen Davis[3] is the President of Safety Barriers and her husband, defendant C. Reed Davis, is the Executive Vice-President of Safety Barriers.

5.      Mr. Davis was the previous owner of C. Reed Davis Contractors. He also operates a business known as Specialty Crane & Equipment. In approximately 2001, Mr. Davis got into the barrier business and started Safety Barriers. He initially started selling Guardian brand barriers. He began looking for another supplier when Guardian moved their manufacturing to California. Mr. Davis sought to find a manufacturer geographically closer to Knoxville to cut down on the cost and time delay in transporting the barriers to his facility.

6.      At some point in 2002, Mr. Davis contacted Mr. Wasserstrom and introduced himself. Mr. Davis indicated that he had started a business selling plastic traffic barriers and was looking for a new supplier located closer to Tennessee.

---

[3]Karen Davis was a previously named defendant in this case. The claims against Ms. Davis were dismissed at trial upon motion for directed verdict.

7.     Mr. Davis invited Mr. Wasserstrom to visit the facility of Safety Barriers in Knoxville to explore the possibility of a business relationship whereby Safety Barriers would acquire barriers from Traffic Safety for resale.  Mr. Wasserstrom came to Knoxville and inspected the Safety Barriers facility.  Mr. Wasserstrom was impressed with Mr. Davis's idea of trucks that could haul a significant amount of barriers.  Following his visit to Knoxville, Mr. Wasserstrom believed that Safety Barriers had the facility, personnel, and capabilities to be a distributor for Traffic Safety.

B.     The Witnesses

8.     Ron Tourte was formerly employed by Mr. Davis in the Specialty Crane and Safety Barriers businesses from February or March 2002 until December 2003.  Mr. Tourte performed general laborer work on equipment and trucks.

9.     Mark McKinney is the nephew and former employee of Reed and Karen Davis. Mr. McKinney worked for Safety Barriers as a sales representative from June 2002 to September 2003.

10.     Maxine O'Domirok was previously employed by Safety Barriers as a bookkeeper from February 2002 to late 2002.  Prior to that, she worked for C. Reed Davis Contractors for approximately ten years.

11.     Robert Patterson previously worked for Safety Barriers as a marketing consultant to develop a marketing plan for sales of the Roadguard barriers.

12.     James Barillaro was previously employed by Mr. Davis's businesses, Specialty

Crane and Safety Barriers, from April 2002 until December 27, 2002.  Mr. Barillaro worked

as a truck driver and performed mechanical and electrical work.

13.     The record contains the deposition of Brian Brough, a general manager at

Rotational Molding.

14.     The record also contains the deposition of David Little, the President and CEO

of Rotational Molding.

C.     The Contract

15.     After several discussions, on or about May 31, 2002, Traffic Safety and Safety

Barriers entered into a Distributorship Agreement whereby Traffic Safety agreed to supply

and Safety Barriers agreed to purchase a minimum of 3,000 Roadguard Standard Barrier

products per year in exchange for the exclusive distributorship rights of Traffic Safety's

products within a defined territory.[4]  [Pl. Ex. 1.]

16.     The contract identified the delivery point as the Rotational Molding facility in

Brigham City, Utah.  [*Id*. at 1.]  The barriers were delivered to Safety Barriers F.O.B. point

of origin such that Safety Barriers assumed ownership and responsibility for the barriers

when they were loaded onto a truck at the Rotational Molding facility in Utah.  Safety

---

[4]The territory consisted of the following southeastern states:  Tennessee, Kentucky, North
Carolina, South Carolina, Georgia, Arkansas, Alabama, Mississippi, Louisiana, and Florida.  [Pl.
Ex. 1 at 1.]

Barriers was also therefore responsible for the cost of transporting the barriers from Utah to Knoxville or other destinations.

17.    Pursuant to the terms of the contract, Safety Barriers agreed to "use its best efforts to distribute the Products and to fully develop the market for the Products within the Territory."[5]  [*Id*. at 2.]  Safety Barriers further agreed not to distribute competing products within the territory.

18.    Pursuant to the contract, the purchase price was $285 per barrier less a freight allowance of $10 per unit, for an effective price of $275 per barrier.  The freight allowance only applied to the standard Roadguard barrier and did not apply to the corner units or other products.

19.    The parties agreed that the "individual contracts for the sale of Products formed by Distributor's [Safety Barriers] submission of orders to Supplier [Traffic Safety] pursuant to the terms and conditions hereof shall automatically incorporate, to the extent applicable, the terms and conditions hereof, shall be subject only to those terms and conditions (together with all terms in orders which are contemplated by this Agreement) and shall not be subject to any conflicting or additional terms included in any documents exchanged in connection therewith."  [*Id*. at 4.]

---

[5]There is some evidence that Safety Barriers had made preliminary arrangements with other entities to become local distributors of the Roadguard barrier products.  However, it appears that such relationships never fully materialized, and no contractual evidence of such relationships was presented at trial.

20.     The parties further agreed that Safety Barriers would "examine the shipment to determine whether any item or items included in the shipment are defective. Within ten (10) days of receipt of the shipment [Safety Barriers] shall notify [Traffic Safety] in writing of any defects which [Safety Barriers] claims existed at the time of delivery." The parties agreed that, unless such notice was provided, Safety Barriers "shall be deemed to have accepted such Products and to have waived all claims for defects." [*Id*. at 5.]

21.     Mr. Wasserstrom considered the inspection requirement mandatory.[6] Mr. Davis testified that this requirement was "just about impossible" to meet after taking into consideration the time for delivery and unloading. [Tr. at 681.] He further testified that he agreed to this provision because he thought he was going into business with reputable people and had something that would work for both parties.

22.     The contract provided that payment was due 45 days after Safety Barriers's receipt of invoice from Traffic Safety. [Pl. Ex. 1 at 5.]

23.     The contract term was for one year and was automatically renewable for one-year terms unless earlier terminated. [*Id*. at 5.]

24.     Either party could terminate the contract "upon written notice to the other party, if the other party materially breaches any term or condition of this Agreement and fails

---

[6]Mr. Wasserstrom testified that all of the barriers were tested prior to leaving the Rotational Molding facility. Brian Brough testified that both the "A" and the "B" barriers were tested before the order was filled. [Pl. Ex. 26 at 23.]

to cure that breach within thirty (30) days after receiving written notice of the breach." [*Id.* at 5-6.]

25.     The contract also provides upon termination that "each party shall promptly pay the other party any unpaid amounts due as of the termination or expiration." [*Id.* at 6.]

26.     The agreement further provides that if termination is due to Traffic Safety's breach, then Safety Barriers has the option to return all product in its inventory and Traffic Safety agrees to fully refund amounts paid for such product. [*Id.* at 6.]

27.     The contract states that "[n]either party will be liable for damages of any kind as a result of exercising its right to terminate this Agreement according to its terms, and termination will not affect any other right or remedy at law or in equity of either party." [*Id.* at 6.]

28.     Finally, the contract provides that it will be governed by and interpreted according to the laws of the Commonwealth of Pennsylvania. [*Id.*]

29.     The parties presented much testimony about "A" barriers and "B" barriers. An "A" barrier is one that is water tested by the manufacturer and does not leak. A "B" barrier is one that is water tested by the manufacturer and leaks. The manufacturer then repairs the leak and the repaired barrier is sold as a "B" barrier at a reduced price. The contract does not mention or differentiate between "A" barriers and "B" barriers, although there was some testimony that the listed price for a standard Roadguard barrier ($285.00) is the price of an "A" barrier.

30.     Traffic Safety warrants that all of its barriers will not leak.  Traffic Safety also provides that any barrier that leaks, whether an "A" or a "B" barrier, can be returned for full credit.[7]

31.     Mr. Wasserstrom testified that the parties' contract only dealt with "A" barriers.  Mr. Davis testified that he did not consider whether or not the "B" barriers would count toward the 3,000 barrier per year contract requirement.  He stated that Safety Barriers had a year to purchase 3,000 barriers, and he was confident they could do it.

D.      The Three Shipments

i.      The First Shipment

32.     On or about June 10, 2002, Safety Barriers placed the first order for Roadguard products.  Safety Barriers ordered 65 natural or white barriers, and 65 orange barriers.  [Def. Ex. 1.]  However, Safety Barriers received 65 orange barriers, 49 natural barriers, 4 natural barrier corners, and 2 orange barrier corners.  [Def. Ex. 2.]

33.     On June 11, 2002, Traffic Safety invoiced Safety Barriers for the first order for a total amount of $32,100.  Safety Barriers paid for the first shipment in full on or about July 15, 2002.

34.     All of the invoices from Traffic Safety contain the following terms: (1) Interest of 1.5% per month (18% APR) will be added to past due accounts; (2) Merchandise remains

_____

[7]David Little, the President and CEO of Rotational Molding of Utah, testified by deposition that the "B" barriers were not guaranteed against leaks and were not returnable.  [Def. Ex. 44 at 29.] He also testified that Rotational Molding did not guarantee *any* of Traffic Safety's products due to a problem with the molds.  [*Id*. at 84.]  Brian Brough of Rotational Molding testified that the "A" barriers were guaranteed against leaks.  [Pl. Ex. 26 at 23.]

the property of Traffic Safety Devices, Inc. until invoice is paid in full; (3) In the event that an attorney or legal action is needed to enforce collection of this invoice, reasonable attorney and/or legal fees shall be added to this invoice.  [Pl. Exs. 3, 5, 7.]  The back of the invoice contains a limited warranty and disclaimer.

35.     The first shipment of barriers was picked up at Rotational Molding's facility in Utah by Safety Barriers employee Jim Barillaro in a Safety Barriers truck and transported to Safety Barriers' facility in Knoxville.

ii.     The Second Shipment

36.     On or about June 27, 2002, Safety Barriers placed a second order for barriers. Safety Barriers ordered 100 orange barriers to be delivered by common carrier directly to the Department of Military Procurement Division (hereinafter "National Guard") in Nashville, Tennessee.  [Def. Ex. 5.]

37.     Three Safety Barriers employees met the truck in Nashville to visually inspect the barriers and offload them.  The National Guard would not allow Safety Barriers to water test the barriers.  On June 27, 2002, Traffic Safety invoiced Safety Barriers for this order for a total amount of $27,500.  [Pl. Ex. 5.]  This invoice contains the same terms and the same limited warranty and disclaimer as the first invoice.  Safety Barriers did not pay for this shipment.

38.     Safety Barriers was charged $1,577.00 by a common carrier, J&S Cartage, Inc., to ship the barriers from Brigham City, Utah, to the National Guard facility in Nashville. [Def. Ex. 28.]  Safety Barriers paid the J&S invoice on or about July 25, 2002.  [Def. Ex. 29.]

iii.     The Third Shipment

39.     On or about July 8, 2002, Safety Barriers ordered 4 orange corners, 10 yellow barriers, 34 natural "B" barriers, and 84 orange "B" barriers.  [Def. Ex. 7.]  These barriers were to be shipped to Safety Barriers's facility in Knoxville.

40.     On July 8, 2002, Traffic Safety invoiced Safety Barriers for the third shipment for a total amount of $30,770.  [Pl. Ex. 7.]  With respect to the "B" barriers on this order, the invoice contains the following notation: "These are 'B's' - Sold "AS IS", NO WARRANTY." [*Id.*] This invoice contains the same terms, limited warranty, and disclaimer as the previous two invoices.  Safety Barriers did not pay for the third shipment.

41.     Mr. Davis testified that the "B" barriers were ordered for a job in Florida which fell through before the barriers arrived in Knoxville.

42.     It is undisputed that Traffic Safety did not receive notice of any defects within ten days of any of the three shipments.

E.     Complaints About the Barriers

43.     In approximately mid-July, after the second shipment of barriers had been delivered and unloaded, Safety Barriers was notified by Major Joe Hollister of the National Guard that some of the barriers began leaking after they were filled with water.

44.     Mr. Davis immediately notified Mr. Wasserstrom about the leaking barriers. Mr. Wasserstrom reportedly told Mr. Davis to take care of the customer.

45.    Mr. Wasserstrom testified that he understood that five of the one hundred barriers shipped to the National Guard were replaced. He also testified that he issued Safety Barriers a credit for all of the claimed defective barriers.

46.    Mr. McKinney testified that approximately 5 to 10 barriers delivered to the National Guard leaked.

47.    After Safety Barriers received the complaint about leaking barriers at the National Guard, Safety Barriers began testing all of the barriers in its stock. Specifically, employees of Safety Barriers unloaded barriers from the first shipment that were still on a truck at their facility and began testing them. They took 100 barriers from that shipment to Nashville and swapped them with the 100 barriers that were delivered to the National Guard. The National Guard barriers were then brought back to Knoxville for testing.

48.    As a result of the complaints of leaking barriers, Safety Barriers replaced much of the shipment delivered to the National Guard with barriers that Safety Barriers had in inventory. Mr. Davis estimated that approximately 35 of the barriers originally delivered to the National Guard were good barriers, and these barriers were returned to Nashville.

49.    After the problem with the National Guard shipment, Safety Barriers suspended its marketing and sales efforts of the Roadguard products.

50.    On July 23, 2002, Safety Barriers sent a letter to Mr. Wasserstrom expressing "total disgust for the complete absence of quality control with regards to the Roadguard polyethylene barriers." [Pl. Ex. 8.] The letter notified Traffic Safety that four of the first six units filled at the National Guard facility leaked. The letter also advised that Safety Barriers

began testing their "A" barriers and found that five of seven initially checked were leaking. The letter further states that "[w]e were warned about Rotational Molding of Utah by a competitor suggesting questionable quality and lack of quality control."[8] [*Id.*] The July 23, 2002 letter concludes:

> Safety Barriers, Inc. in no way feels any obligation to incur **any expense** of retesting, loading, unloading and/or transporting these inferior products at two locations in middle Tennessee as well as stock units on our yard in Knoxville. Loss of revenue on present rentals is also in question.

[*Id.*] Mr. Wasserstrom testified that he received this letter via facsimile on July 24, 2002.

51.     On August 6, 2002, Mr. Wasserstrom sent a letter in response to Mr. Davis. [Pl. Ex. 9.] In that letter, Mr. Wasserstrom stated in part as follows:

> **ALL** Roadguard Barriers are to be leak free when delivered to our customer! If some are defective, they will be replaced.
> However, only alleged defective ones should be returned for an exchange. To analogize, it is like buying corn from a farmer on a regular basis; when you shuck a few and find them bad, you do not return the entire purchase of corn until the amount of bad ones is determined by shucking the entire purchase. The same is true here.

[*Id.*]

52.     Mr. Davis immediately responded to Mr. Wasserstrom with an August 6, 2002 letter sent by facsimile. [Pl. Ex. 10.] Mr. Davis advised that Safety Barriers had tested some of the shipment due to replacement of leaking barriers at the National Guard facility and were seeking advice in developing a cost effective method to test the remaining barriers. Mr.

---

[8]In contrast, Mr. Wasserstrom testified that his experience with Rotational Molding was very good. "We have had very few returned barriers or claims over the years of them with them." [Tr. at 160.]

Davis also stated that Safety Barriers "did not envision that we would need to test each barrier we received from your company." [*Id*.] Mr. Davis stated that Safety Barriers needed to resolve the issue on two levels: first, Safety Barriers needed "to determine what to do with the barriers that we have due to the high percentage we believe may be defective." [*Id*.] Second, Safety Barriers "cannot reliably count on your company as a source for barriers." [*Id*.] Mr. Davis stated that Safety Barriers expected to be reimbursed for the cost of testing if the barriers proved to be defective. Mr. Davis concluded the letter as follows:

> We need a response from you as soon as possible in order to determine what relationship our companies will have in the future. Upon our initial meeting I had great hopes of a mutually beneficial relationship. I anxiously await your reply in order to determine if this is still possible.

[*Id*.] Mr. Wasserstrom agreed that this letter was a request for adequate assurances from Safety Barriers.

53. As to the second issue outlined in his letter, Mr. Davis testified that he was referring to a pending order from a company in South Carolina. In light of the problems in Nashville, Mr. Davis said he could not take a chance of sending a shipment of barriers to South Carolina and risk further leaky barriers.

54. The record contains evidence that during this time period the parties were also discussing changing their relationship from a distributorship to a licensee relationship. Moreover, the parties were also discussing having the barrier products manufactured by Rotocast of Tennessee, located in Knoxville, rather than by Rotational Molding of Utah.

55.     Safety Barriers tested all of the barriers at its facility, including those it retrieved from the National Guard as well as the barriers it had received from Rotational Molding.  Safety Barriers discovered that many of the barriers leaked, primarily in the areas where the barriers would inter-lock with each other or at the plug caps.  Mr. McKinney testified that many of the leaks were "little pinhole leaks" that were not immediately visible. [Tr. at 306-307.]

56.     Former employees Mike Kimbrough, Mark McKinney, Ron Tourte, and Jim Barillaro were involved in testing the barriers.[9]   In an attempt to streamline the process, Mr. Tourte built a testing tank so that the water could be reused.

57.     Mr. McKinney estimated that the testing took a couple of weeks.  Mr. Tourte estimated that the testing lasted for approximately one month.  Mr. Patterson estimated that it took "weeks" to test the barriers.  [Tr. at 473.]  However, defendant's estimate of expenses incurred in testing barriers indicates that it took three employees a total of 263 employee hours to test the barriers, thus approximately 87.6 hours to test the barriers.

58.     Mr. McKinney testified that some of the barriers had cracks in them and appeared to have been mishandled in the loading process.

59.     Mr. McKinney testified that he took pictures and made a record of the results of the testing.  The record contains a copy of the handwritten testing record made by Mr.

---

[9]There was some testimony that an employee named Matson West, often referred to as "Stoney," also assisted with the barrier testing.

McKinney. [Def. Ex. 32.] The record also contains several photographs of the barriers during the testing process and the area where the barriers were located.

60.     Mr. Patterson testified that he took "several hundred" pictures of the barriers during the testing process. [Tr. at 453.] Those pictures were not located or presented at trial. He also recalled that a record was made of the results of the testing with a more detailed description than that contained in Defendant's Exhibit 32. That documentation was never presented at trial.

61.     Mr. Patterson testified that, at that time, he was not trying to get out of the contract. "I was trying to move forward and make this thing get to fruition and launch this thing where I could make some money." [Tr. at 473.]

62.     Traffic Safety guaranteed that the barriers would not leak. Mr. Wasserstrom testified that this meant they would replace a defective product or give full credit. By way of a credit memo dated August 20, 2002, Traffic Safety issued Safety Barriers a credit totaling $24,945.00. [Pl. Ex. 33.] That credit memo was later withdrawn for purposes of the litigation after Mr. Wasserstrom received the testing report from Rotational Molding of Utah.

63.     On or about August 28, 2002, Safety Barriers returned 106 allegedly defective barriers to Rotational Molding in Utah by two common carrier trucks. Traffic Safety incurred freight expenses totaling $3,995 for the cost of shipping the allegedly defective barriers from Knoxville to Utah. [Pl. Ex. 23, 24.] Safety Barriers retained approximately 60 barriers on its property, and Traffic Safety has refused to pick those up. Mr. Davis testified that they kept a few defective barriers to demonstrate the problems with them.

64.     On September 5, 2002 at 1:16 p.m., Safety Barriers faxed Mr. Wasserstrom a list of expenses incurred in the testing of barriers.  [Def. Ex. 30.]  Mr. Davis testified that he was asked to compile the figures for reimbursement of testing expenses.  Safety Barriers sought reimbursement of these expenses totaling $11,419.70.  Mr. Wasserstrom testified that he believed many of the charges were excessive.

65.     Also on September 5, 2002 at 1:44 p.m., Safety Barriers sent a fax to Mr. Wasserstrom as follows: "If the amounts in the earlier fax are acceptable, we would like to move forward and continue."  [Pl. Ex. 32.]  Mr. Davis testified that Safety Barriers wanted to continue doing business with Traffic Safety.

66.     On September 5, 2002 at 4:15 p.m., via facsimile, Mr. Wasserstrom responded to Safety Barriers's request for reimbursement of expenses in testing the barriers.  Traffic Safety offered to reimburse Safety Barriers in the amount of $5,055.40, or approximately half of what Safety Barriers had requested.  [Pl. Ex. 12.]  Mr. Wasserstrom testified that he made this offer to try to accommodate Mr. Davis and continue the parties' relationship.  Mr. Wasserstrom's letter also advised Mr. Davis that he would not revisit "the previously granted credit for the returned barriers even though RMU is questioning the condition of some of the returned barriers, i.e., fork lift holes, tire marks on side, being dropped from truck as opposed to be unloaded by fork lift or hand, using rods inserted in channels which caused damage, etc."  [*Id.*]

67.     In response, also on September 5, 2002 at 4:55 p.m., Mr. Davis notified Mr. Wasserstrom that he was bringing the dispute to his attorneys and that "all negotiations are

off at this time." [Def. Ex. 18.] He further advised that he considered plaintiff to be in breach of the parties' agreement "since the product you have given us is not suitable for its intended purpose." [*Id*.] Mr. Davis testified that the letter "was letting him know that I wasn't going to accept his reimbursement for testing barriers that shouldn't have been leaking to start with." [Tr. at 661.]

68. Mr. Davis testified that he sent this letter after he and Mr. Wasserstrom had a heated discussion over testing barriers. Mr. Davis stated that they could not resolve the issue of leaky barriers and at that point he "was ready to throw in the towel." [Tr. at 551.]

69. By letter dated September 13, 2002, Safety Barriers, through its attorney, notified Traffic Safety of the termination of the contract based on Traffic Safety's failure to provide adequate assurances of plaintiff's ability to perform and Traffic Safety's failure to cure their breach of the agreement. [Def. Ex. 19.]

70. Brian Brough of Rotational Molding performed testing on the 106 barriers returned to its facility and reported the results of that testing to Mr. Wasserstrom by letter dated October 16, 2002. [Pl. Ex. 13.] Rotational Molding advised Mr. Wasserstrom that 36 "A" barriers and 70 "B" barriers were returned. Rotational Molding concluded that 31 of the 36 "A" barriers and 39 of the 70 "B" barriers "were clearly subject to abuse, misuse or were returned without any problems to the barrier." [*Id*.] Mr. Brough's letter further stated:

> Based on our past history of success, we feel that the other returned barriers were also subject to misuse, but we cannot conclude this with certainty. Most likely, the barriers were damaged during transportation. Many of the barriers are so clearly abused and damaged that the remainder were more than likely subject to the same treatment. As a result of this misuse of the product,

Rotational Molding of Utah does not feel that they should bear the cost of the barriers that were clearly not returned due to any fault of RMU.

[*Id.*]

71.     When asked to describe what he meant by "abuse" and "misuse," Mr. Brough testified as follows:

> For example, many of them were split, and mostly along the male end. And that is typical of what we've seen over the years of when these barriers were dropped on that end, when they're just shoved off the truck and allowed to fall on that, they would split on the corners. and that was typical of them.
> On some of them we saw some gash marks in there that looked like they had been put there by forklift tines. There was even a couple that we could see some tire marks that had gone over them, looked like they had been backed over or something to that effect.

[Pl. Ex. 26 at p. 24.]

72.     Thus, Rotational Molding gave Mr. Wasserstrom credit for five "A" barriers and 31 "B" barriers, *i.e.*, the barriers which Rotational Molding could not determine were subject to intentional abuse, which Mr. Wasserstrom passed on to Safety Barriers. Rotational Molding also charged Traffic Safety $1000 for the inspection and retesting. [Pl. Ex. 16.] Mr. Wasserstrom paid Rotational Molding for the remaining barriers that were determined to have been intentionally damaged.

73.     In connection with its inspection of the returned barriers, Rotational Molding prepared a detailed report which itemizes each barrier tested and the results of that test. [Pl. Ex. 14.] The report specifies whether the barrier leaked or not, whether the barrier was

damaged or dropped, or if there was no problem with the barrier. The report does not identify any barrier as having drill holes.

74. Traffic Safety has not retrieved, tested, or inspected the returned barriers. The returned barriers are presently in the custody of Rotational Molding in Utah.

75. The record reflects that Safety Barriers kept some of the barriers and has used them as rental barriers for which it has received income.

F.  Allegations of Fraud

76. Traffic Safety alleges that Mr. Davis directed Safety Barriers's employees to intentionally tamper with the barriers and make them leak. Traffic Safety also alleges that employees of Safety Barriers were directed to falsely mark some of the barriers as being defective when they did not in fact leak.

77. Mr. Tourte testified that Mr. Davis advised him that barrier sales were not what he expected them to be.

78. Mr. Tourte estimated that thirty percent (30%) of the barriers received from Utah were good barriers and did not leak. Some of the barriers came from the factory leaking through the drain plug.

79. Mr. Tourte testified that after the third shipment of barriers was received by Safety Barriers, Mr. Davis directed him and Jim Barillaro to make some of the barriers leak and he did so. Mr. Tourte said he did this by drilling holes in the barriers using a 1/8" drill bit. Mr. Tourte also testified that Mr. Davis directed him to mark some barriers as defective that were not in fact defective.

80. According to Mr. Tourte, Mr. Davis stated "we are going to go into a lawsuit on this. We need more of them that leak." [Tr. at 264.] Mr. Davis reportedly said "do whatever you have to do to make them leak." [*Id.*] Mr. Tourte testified that fellow employee Maston West was aware that he was drilling holes in some of the barriers. Mr. Tourte estimated that he intentionally damaged about 25% to 35 % of the barriers.

81. Mr. Tourte testified that some of the barriers were handled especially roughly and fell off the truck. He also testified that some of the barriers were dropped as they were moved around the Safety Barriers's premises.

82. Mr. Barillaro testified that he heard Mr. Davis instruct Mr. Tourte to damage the barriers. He testified that he believes Mr. Tourte damaged the barriers because he saw "little holes in them that were perfectly drilled" and because Mr. Tourte told him what he did. [Tr. at 695.] He also testified that he marked defective the barriers that leaked. However, he also admitted that he never saw anyone drill any holes in the barriers.

83. Mr. Davis denied that Mr. Tourte drilled holes in the barriers. He also denies telling Mr. Tourte to damage the barriers.

84. Mr. Davis testified that Mr. Tourte was let go from Mr. Davis's other company, Specialty Crane & Equipment, after Mr. Davis discovered Mr. Tourte in his office on a Saturday morning going through his files.

85. Mr. McKinney testified that he was present during most of the testing. He testified that he has no knowledge of any intentional abuse or destruction of the Roadguard barriers. He did not see anyone, including Ron Tourte, drill holes in the barriers and believes

that he would have been aware of such conduct if it had occurred.  Mr. McKinney testified

that "Safety Barriers, as a company, didn't drill any holes in any barriers."  [Tr. at 351.]

86.     Maxine O'Domirok, former bookkeeper for Safety Barriers, testified that she

was unaware of any intentional abuse of the barriers.

87.     Robert Patterson, a former marketing consultant for Safety Barriers, testified

that he was unaware of any intentional abuse of the barriers and he does not believe that Mr.

Tourte drilled holes in the barriers to make them leak.

88.     Mr. McKinney testified that Mr. Davis instructed his employees to handle the

barriers very carefully and to always have two people loading and unloading the barriers.

89.     Mr. McKinney marked the barriers that leaked.  He denies that any barriers

were marked as leaking when they did not leak.  He also denies that any non-leaking barriers

were sent back to Utah.

G.     Trade Shows

90.     Pursuant to the parties' agreement that Safety Barriers would use its best efforts

to market, advertise, and promote the product, Safety Barriers agreed to attend the Homeland

Security Summit in Atlanta, Georgia.  Mr. Wasserstrom had agreed to pay for the booth

space and furnishings in order for Safety Barriers to attend the show.

91.     In response to a September 12, 2002 e-mail, Mr. McKinney advised Mr.

Wasserstrom on September 13, 2002, that Safety Barriers representatives would not attend

the Homeland Security Summit.  Traffic Safety incurred expenses of $1,500 as a result of this

cancellation.  [Pl. Ex. 22.]

92.     On September 18, 2002, Mr. McKinney further advised Mr. Wasserstrom that Safety Barriers would not attend the American Public Works Association Expo in Kansas City, Missouri and that "all business with roadguard is on hold until further notice."  [Pl. Ex. 18.]  Traffic Safety incurred expenses of $2000 as a result of this cancellation.  [Pl. Exs. 20, 21.]  However, Mr. Wasserstrom admitted that at the time he reserved this booth space there was no contract in effect between Traffic Safety and Safety Barriers.

93.     Safety Barriers similarly refused to attend the International Public Works Congress for which Traffic Safety incurred expenses of $263.07.  [Pl. Ex. 19.]

94.     Mr. Wasserstrom admitted that the distributorship agreement does not require Safety Barriers to attend trade shows or conventions.

H.     Damages

95.     As set forth in Plaintiff's Exhibit 31, Traffic Safety seeks contractual damages totaling $418,964.60.  These damages include the invoices for the second and third shipments which were not paid plus attorney's fees and interest, the cost of freight for the returned barriers, product exhibition expenses for the trade shows not attended by Safety Barriers, inspection costs of the returned barriers, and lost profits pursuant to the distributorship agreement.

96.     As set forth in Defendant's Exhibit 30, Safety Barriers seeks damages totaling $11,419.70 for the expenses incurred in testing the defective barriers.

## II.    Conclusions of Law

This case presents the Court with an unusual situation in which two businesses, run by experienced businessmen, entered into a contractual arrangement for the sale of plastic traffic barriers and that arrangement promptly fell apart. The reasons for the disintegration of the parties' relationship is puzzling as there was little testimony of conversations, negotiations, or attempts by the two companies to resolve their differences. Rather, the parties engaged in a furious exchange of letters in slightly over a month and then ceased all business. Moreover, every witness told a (sometimes slightly, sometimes significantly) different version of the facts, thus making it virtually impossible to reconcile the testimony into a coherent whole. The Court has nevertheless attempted to sort through the numerous contract and Uniform Commercial Code[10] ("UCC") theories raised by the parties in a logical and orderly fashion.

### A.    Contract Claims

As provided in the contract and as previously noted by this Court [*see* Doc. 132], the parties' contract specifies that it is to be "governed by and interpreted in accordance with the laws of the Commonwealth of Pennsylvania." [Pl. Ex. 1 at 6.]

Pennsylvania law requires three elements to assert a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Williams v. Nationwide Mut. Ins. Co.*,

---

[10]References and citations to the UCC are to the UCC as adopted by Pennsylvania.

750 A.2d 881, 884 (Pa. Super. Ct. 2000). There is no dispute that the parties had a contract, Plaintiff's Exhibit 1, which set forth the essential terms of the parties' agreement.

It is undisputed that Safety Barriers did not pay for the second and third shipments of barriers. It is also undisputed that Safety Barriers did not purchase 3,000 Roadguard barrier products during the first year of the contract. Further, it is undisputed that Safety Barriers did not notify Traffic Safety within ten (10) days of receipt of any defects in the barriers. Thus, the Court is compelled to conclude at the outset that Safety Barriers has breached the contract. The Court must next consider Safety Barriers's arguments in support of its counter-claim and defenses.

    1.    <u>Implied Warranty of Merchantability</u>

Safety Barriers first argues that the barriers sold by Traffic Safety leaked and were therefore defective and unfit for their intended purpose. In short, Safety Barriers argues that the barriers failed to meet the implied warranty of merchantability, that is, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa. Cons. Stat. Ann. § 2314(a). The statute further defines the merchantability standards for goods as follows:

> **(b) Merchantability standards for good.** --Goods to be merchantable must be at least such as:
> (1) pass without objection in the trade under the contract description;
> (2) in the case of fungible goods, are of fair average quality within the description;
> (3) are fit for the ordinary purposes for which such goods are used;
> (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

> (5) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (6) conform to the promises or affirmations of fact made on the container or label if any.

13 Pa. Cons. Stat. Ann. § 2314(b). Safety Barriers argues that the barriers were not fit for the ordinary purposes for which such barriers are used, citing *Repco Products Corp. v. Reliance Electric Co.*, 100 B.R. 184 (E.D. Pa. 1989), where the court found that a 4% failure rate constituted a breach of the implied warranty of merchantability. Thus, where the testing of Safety Barriers revealed 106 defective barriers out of 342, or a 31% failure rate, Safety Barriers contends that the barriers were unfit for their intended purpose. Even relying on the numbers from the testing by Rotational Molding, Safety Barriers points out that 36 defective barriers out of 342 constitutes a failure rate of 9.5% and is also a breach of the implied warranty of merchantability.

Traffic Safety argues that defendant cannot recover for breach of the warranty of merchantability because it has failed to show that the barriers were defective at the time of delivery; that the barriers were used as intended by the defendant or in a manner "reasonably expected" by the manufacturer; and that there is an "absence of other reasonable secondary causes."

To establish a breach of the implied warranty of merchantability, Safety Barriers must establish that the barriers were defective. *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3rd Cir. 1992). A defect may be shown by circumstantial evidence. *Id.* In order to meet such a burden, the defendant must show: (1) that the product malfunctioned;

(2) that defendant used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes. *Id*.

In the present case, even the plaintiff concedes, based on the evidence presented from Rotational Molding, that some of the barriers leaked when filled with water. The plaintiff did not perform any independent inspection or testing and relies solely on the evidence from Rotational Molding. Traffic Safety relies on the absence of any evidence of defects at the time of delivery, that is, when the barriers were loaded onto trucks at the Rotational Molding facility. However, the only testimony concerning the condition of the barriers at the time of delivery came through hearsay to which no objection was raised. Mr. Davis and Mr. McKinney testified that Jim Barillaro reported that the barriers were being handled roughly by the employees loading them at Rotational Molding. However, Mr. Barillaro was never questioned on that subject and provided no testimony on that point. Safety Barriers presented several witnesses who testified that many of the barriers leaked and even Traffic Safety, through the report of Rotational Molding, acknowledges that some of the barriers leaked. Thus, Safety Barriers has shown that the product malfunctioned.

It is undisputed that the barriers are designed to hold water or other material. And, as just noted, the record reflects that some of the barriers leaked when filled with water. Safety Barriers has shown that the product was used as intended or reasonably expected by the manufacturer.

Thus, the issue is whether Safety Barriers has shown the absence of other reasonable secondary causes. Although not specifically stated as such, it appears that Traffic Safety's

argument on this point is that the barriers were intentionally damaged at Mr. Davis's direction as testified to by Ron Tourte and Jim Barillaro. Mr. Tourte testified that he was instructed by Mr. Davis to intentionally damage the barriers and he did so. He claims that he drilled holes in several of the barriers with a one-eighth inch drill bit. Mr. Barillaro testified that he heard Mr. Davis say "damage them" when talking to Mr. Tourte and that Mr. Tourte told Mr. Barillaro that he had intentionally damaged some of the barriers. Mr. Barillaro also testified that he did not personally observe Mr. Tourte damage any of the barriers, with the exception of one barrier that he observed Mr. Tourte puncture with a forklift, and he did not observe Mr. Tourte drill holes in the barriers. Mr. Barillaro did testify that he observed drill holes in some of the barriers. Mr. Davis denied instructing any employees to damage the barriers. The Court notes that the testing report from Rotational Molding did not cite any evidence of drill holes, although Mr. Brough did conclude that many of the barriers were "clearly abused and damaged." [Pl. Ex. 13.] The Court further notes that the testimony of Mr. Brough and Mr. Little were presented by deposition without the opportunity to observe the witnesses and assess their credibility.

On the whole, the Court concludes that Mr. Tourte's testimony is not credible and that his testimony regarding the drill holes is simply not believable. No other witness at Safety Barriers could confirm observing Mr. Tourte damaging the barriers. Given that up to four other employees participated in the testing, it is simply implausible that Mr. Tourte could have drilled holes in the barriers without someone seeing it or hearing it. Mr. Barillaro testified that he observed drill holes in some of the barriers and that Mr. Tourte told him what

he had done. However, significantly, the Rotational Molding report does not mention drill holes in the barriers. Instead, the accompanying letter from Brian Brough suggests that "[m]ost likely, the barriers were damaged during transportation." [Pl. Ex. 13.] The Court heard various testimony that the barriers were handled roughly by the Rotational Molding employees who loaded the barriers onto a Safety Barriers truck, that the barriers were handled roughly by Safety Barriers employees who unloaded the barriers, and that the barriers were handled roughly by National Guard personnel unloading the barriers. Additionally, the Rotational Molding report indicated that some of the returned barriers leaked for reasons that could not be attributed to abuse. In other words, there is a scintilla of evidence to support several theories as to why the barriers leaked, but far less than a preponderance of the evidence to support any one particular theory. On the whole, the Court finds that Safety Barriers has shown the absence of other reasonable secondary causes for the defective barriers. Safety Barriers has established that Traffic Safety breached the implied warranty of merchantability by failing to supply barriers that were fit for the ordinary purposes for which such barriers are used.

### 2. Request for Adequate Assurances

Safety Barriers next argues that the August 6, 2002 letter gave Traffic Safety notice of its grounds for insecurity with respect to the ability of Traffic Safety to provide a merchantable product. Because Traffic Safety never provided such assurances, Safety Barriers argues that it properly considered the contract as repudiated.

Traffic Safety responds that, despite the failure of Safety Barriers to comply with the ten-day notice period, Traffic Safety provided Safety Barriers with credit for the allegedly defective barriers inasmuch as Safety Barriers requested credit instead of replacement units.

The UCC provision on the right to adequate assurance of performance states in part as follows:

> **(a) General rule.**–A contract for sale imposes an obligation on each party that the expectation of the other of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> * * *
>
> **(d) Effect of failure to provide assurance.**–After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

13 Pa. Cons. Stat. Ann. § 2609(a), (d).  Comment 2 to this section states in part as follows:

> First, the aggrieved party is permitted to suspend his own performance and any preparation therefor, with excuse for any resulting necessary delay, until the situation has been clarified. ...Secondly, the aggrieved party is given the right to require adequate assurance that the other party's performance will be duly forthcoming. ...Third, and finally, this section provides the means by which the aggrieved party may treat the contract as broken if his reasonable grounds for insecurity are not cleared up within a reasonable time.

13 Pa. Cons. Stat. Ann. § 2609.

As set forth in the facts, the August 6, 2002 letter from Safety Barriers was sent within a few weeks after problems were discovered with the barriers at the National Guard. The letter informed Traffic Safety that "our company will not promote a product we are unable

to stand behind" and "at this time we cannot reliably count on your company as a source for barriers." [Def. Ex. 13.] The letter further concluded "[w]e need a response from you as soon as possible in order to determine what relationship our companies will have in the future." [*Id.*] Mr. Wasserstrom acknowledged that this letter was Safety Barriers' request for adequate assurances from his company. [Tr. at 198.] Traffic Safety issued a credit to Safety Barriers in the amount of $24,945. 00 for the cost of the allegedly defective barriers. [Pl. Ex. 33.] Safety Barriers argues that this offer to exchange or refund the defective barriers was ineffective as far as providing adequate assurances of a quality product.

Traffic Safety does not directly respond to this argument, although its post-trial brief seems to suggest that the credit issued to Safety Barriers was sufficient assurance for the parties to continue their contractual relationship. Mr. Wasserstrom acknowledged that he had not given Mr. Davis adequate assurance as of the August 6, 2002 letter.

UCC section 2609(b) provides that "the adequacy of any assurance offered shall be determined according to commercial standards." 13 Pa. Cons. Stat. Ann. § 2609(b). Comment 4 to this section indicates that what constitutes adequate assurance will vary depending on the circumstances and that the requested assurance need not be due under the contract. *See Brisban v. Superior Valve Co.*, 398 F.3d 279, 286 (3rd Cir. 2005) ("What constitutes 'adequate assurance' is to be determined by factual conditions; [a party] must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious.") (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3rd Cir. 2001)).

Based on the facts outlined above, the Court finds that it was reasonable for Safety Barriers to request adequate assurances from Traffic Safety that it could provide leak-free barriers. Safety Barriers had been required to retrieve barriers delivered to the National Guard and replace them with barriers in its inventory. Mr. Davis testified that he was working on several other potential deals and reasonably did not want to have the same problems as he experienced with the National Guard shipment.

The more difficult question is whether Traffic Safety's issuance of credit was an adequate assurance. The credit memo issued August 20, 2002 indicates that Traffic Safety issued a credit of $24,945.00 toward invoice #206 (the third shipment) and that "additional credit is to be determined for cost of water testing." [Pl. Ex. 33.] Upon learning of the problems with the National Guard shipment, Mr. Wasserstrom also advised Mr. Davis that all Roadguard barriers are to be leak free and any defective barriers would be replaced [*see* Pl. Ex. 9], although this representation was made immediately prior to the August 6 letter demanding adequate assurances. Traffic Safety also offered to reimburse Safety Barriers for some, although not all, of the requested expenses incurred in testing the barriers. Safety Barriers did not order any more barriers, so Traffic Safety was not given the opportunity to provide another shipment of leak-free barriers. It is unclear what else Traffic Safety could have done at that point to provide adequate assurance. The Court finds that Traffic Safety's response was adequate under the circumstances and did not constitute a repudiation of the contract.

3. <u>Notice of Defects/Rejection</u>

The next question the Court must answer is whether the failure of Safety Barriers to provide notice of the defects precludes rejection of the barriers pursuant to the terms of the agreement. Safety Barriers argues it rejected the defective barriers within a reasonable time as defined by 13 Pa. Cons. Stat. Ann. § 1204 which states in part as follows:

> (a) **Time fixed by agreement.**–Whenever this title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.
> (b) **Reasonable time.**–What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.

Comment 1 to section 1204 states that:

> Subsection (1) recognizes that nothing is stronger evidence of a reasonable time than the fixing of such time by a fair agreement between the parties. However, provision is made for disregarding a clause which whether by inadvertence or overreaching fixes a time so unreasonable that it amounts to eliminating all remedy under the contract. The parties are not required to fix the most reasonable time but may fix any time which is not obviously unfair as judged by the time of contracting.

While acknowledging the contract's ten (10) day period for notifying Traffic Safety of defects, Safety Barriers argues that this limitation period is unreasonable within the meaning of § 1204 because the defects were not detectable by visual inspection. Citing *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1218 (3rd Cir.), *cert. denied*, 400 U.S. 826 (1970), Safety Barriers argues that it is unreasonable to require notice when there was no opportunity for the defects to be discovered in the barriers shipped directly to the National Guard. Even with the barriers shipped to Safety Barriers's facility, defendants argue that it was not commercially reasonable to test each and every barrier for defects within ten days.

33

Traffic Safety argues that Safety Barriers did not report any defects within the ten-day period for any of the shipments and therefore defendants are deemed to have accepted the barriers. Further, Traffic Safety argues that Safety Barriers's acceptance of the goods precludes their rejection pursuant to 13 Pa. Cons. Stat. Ann. § 2607 which states in part as follows:

> (b) **Effect of acceptance on remedies for breach.**--Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this division for nonconformity.
> (c) **Notice of breach.**–Where a tender has been accepted:
> (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy... .

13 Pa. Cons. Stat. Ann. § 2607(b) & (c).

In addition to the parties' reliance on competing sections of the UCC, the Court must also consider the contract provisions on inspection and acceptance. The contract provides in part as follows:

> Promptly upon the receipt of a shipment of Products, Distributor shall examine the shipment to determine whether any item or items included in the shipment are defective. Within ten (10) days of receipt of the shipment Distributor shall notify Supplier in writing of any defects which Distributor claims existed at the time of delivery. ...Unless notice is given as provided in this Section, Distributor shall be deemed to have accepted such Products and to have waived all claims for defects.

[Pl. Ex. 1 at 5.]

As noted previously, it is undisputed that Safety Barriers did not provide notice of any defects within ten days of receipt of any of the shipments. Pursuant to the strict language of the contract, the failure to provide such notice is deemed to be an acceptance of the goods and a waiver of any defects. The question for the Court is whether the ten-day period is unreasonable and should be disregarded. The Court has carefully reviewed the cases relied upon by Safety Barriers and finds them distinguishable.

In *Neville Chemical Co.*, the plaintiff purchased unsaturated oil from the defendant that was used to manufacture resins used for various products, including floor tiles, shoe soles, and rubber matting. 422 F.2d at 1207. The plaintiff began receiving complaints of an intolerable odor from different customers whose products were manufactured from the resin. The parties' contract required the plaintiff to give notice of any defects within fifteen (15) days of receipt of the product. In reviewing this provision, the Third Circuit opined that it was "manifestly unreasonable if it is construed to require that notice be given of latent defects which would not be discoverable until after the time specified has elapsed." *Id.* at 1217. The court concluded that the 15-day notice provision was ineffective under section 1-204(1) of the UCC because the defendant "could not require notice of a defect in its chemical products at a point in time at which it was *impossible* to discover the defect." *Id.* at 1217-18 (emphasis added).

Similarly, in *Repco Prods. Corp. v. Reliance Elec. Co.*, 100 B.R. 184 (E.D. Pa. 1989), the plaintiff manufactured residential boiler units and sued for breach of warranty when the castings used in the units manufactured by the defendant had a high rate of cracking. The

evidence showed that four (4%) percent of the castings produced cracked. *Id*. at 189. Although the plaintiff notified the defendant of the number of cracked boilers with defendant's castings, the defect in the castings which caused the cracking was a latent one and was not discovered until four years after the parties' business relationship ended. *Id*. at 197-98. The court concluded that "[w]hen a defect is thus 'undetectable,' prompt notice of the defect cannot be provided and therefore is not necessary." *Id*. at 198.

Finally, Safety Barriers also relies upon *Q. Vandenburg & Sons, N.V. v. Siter*, 204 A.2d 494 (Pa. Super. Ct. 1964), in which the plaintiff sued for the purchase price of certain tulip and hyacinth bulbs. The defendants asserted a counterclaim for breach of express and implied warranties because the bulbs failed to flower properly. *Id*. at 496. The contract provided that all claims would be deemed waived unless presented within eight (8) days after receipt of the goods. *Id*. The defendant argued that the defects in the bulbs which prevented flowering existed at the time of delivery, but were latent and could not be discovered until flowering time. *Id*. at 498. The court held that "[a] limitation which renders the warranties ineffective as regards latent defects, literally covered by the warranty but not discoverable within the limitation period of the contract, is manifestly unreasonable and therefore invalid under §1-204 of the code." *Id*.

Under each of these three cases, the defect in the product was one which could not be discovered at or near the time of delivery. In other words, discovery of the defect within the contractual time specified was inherently impossible. In the present case, the defects in the barriers could be immediately discovered simply by filling them with water. Although Safety

Barriers argues that they could not test the barriers delivered directly to the National Guard, such difficulty is not an impossibility inherent in the nature of the product. Instead, Safety Barriers assumed the risk that the product might have undetected defects by contracting to sell the barriers to the National Guard. Similarly, although Safety Barriers contends the ten-day inspection period is unreasonable, that is what Safety Barriers agreed to do. If Safety Barriers believed it was not feasible to test a shipment of barriers within ten days, it could have negotiated a different inspection period. The Court does not find that the ten-day inspection period is manifestly unreasonable or unenforceable. Because Safety Barriers was required to seasonably notify Traffic Safety of any defects and did not do so, *see* 13 Pa. Cons. Stat. Ann. § 2602(a), Safety Barriers's rejection of the goods is not effective. Thus, Safety Barriers is deemed to have accepted the barriers. While Safety Barriers must pay the contract rate for any goods accepted, 13 Pa. Cons. Stat. Ann. § 2607(a), it is not precluded from obtaining a remedy for the goods' nonconformity. *See* 13 Pa. Cons. Stat. Ann. § 2607(b); *Envirex, Inc. v. Ecological Recovery Assoc., Inc.*, 454 F. Supp. 1329, 1340 (M.D. Pa. 1978), *aff'd*, 601 F.2d 574 (3rd Cir. 1979) ("the Code makes it equally clear that if a buyer, rather than rejecting goods, accepts them and thereafter fails to revoke his acceptance in accordance with the provisions of the code, he becomes obligated to pay the purchase price of the goods but may thereafter recover his damages as provided in the code for whatever breach of contract occurred.").

4.    Termination/Anticipatory Repudiation

The next issue raised is whether Safety Barriers's September 13, 2002 letter providing notice of termination was effective or whether it was an anticipatory repudiation of the contract.  Traffic Safety argues that the September 13 letter did not constitute a termination because, based on the contract language, termination was not effective until the anniversary date of the contract, May 31, 2003.  Instead, Traffic Safety asserts that the letter constitutes an anticipatory repudiation of the contract.  Safety Barriers contends that it properly terminated the contract due to Traffic Safety's inability to provide merchantable barriers.

The contract provision on termination states in part as follows:

> Either party may terminate this Agreement (a) on May 31 of any year, provided that the terminating party provides at least thirty (30) days written notice to the other party; (b) upon written notice to the other party, if the other party materially breaches any term or condition of this Agreement and fails to cure that breach within thirty (30) days after receiving written notice of the breach...

[Pl. Ex. 1 at 5-6.]  As set forth above, the number of defective barriers supplied by Traffic Safety constituted a breach of the implied warranty of merchantability.  However, as also set forth above, Traffic Safety provided a credit, as requested, for the defective barriers, warranted that all barriers were guaranteed to be leak-free, and offered to compensate Safety Barriers for some of the requested inspection and testing expenses.  Under these circumstances, the Court cannot conclude that Traffic Safety failed to cure the breach.  Thus, based on the contract language, the parties' agreement did not terminate until May 31, 2003.

Under Pennsylvania law, an anticipatory breach requires "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies of Greater Phila.*, 489 A.2d 733, 736 (Pa. 1985) (quoting *McClelland v. New Amsterdam Casualty Co.*, 185 A. 198, 200 (Pa. 1936)). Safety Barriers's September 13, 2002 letter certainly qualifies as an absolute and unequivocal refusal to perform. Thus, the Court agrees that Safety Barriers anticipatorily breached the contract.

B. <u>Intentional Misrepresentation/Fraud Claim</u>

Traffic Safety also asserts a claim for intentional misrepresentation or fraud based on the allegations that Safety Barriers, at Mr. Davis's instruction, intentionally damaged some of the barriers and claimed that they were defective. This claim is based on the testimony of Ron Tourte that he was instructed to intentionally damage the barriers and on the testing report from Rotational Molding. Safety Barriers argues that Traffic Safety has not carried its burden of proof with respect to this claim.

As explained by Tennessee courts, "fraud is a trick or artifice or other use of false information that induces a person to act in a way that he or she would not otherwise have acted." *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005). "Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage." *Id.* The elements of a claim for fraud include: (1) an intentional misrepresentation of an existing material fact; (2) knowledge of the representation's falsity; and (3) injury caused by reasonable reliance

on the misrepresentation.  *Id.*; *First Nat'l Bank of Louisville v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991).

As discussed above, the Court finds Mr. Tourte's testimony that he intentionally damaged some of the barriers by drilling holes in them is simply not credible.  There is no evidence that anyone saw Mr. Tourte damage the barriers.  Mr. Barillaro testified that he saw drill holes in some of the barriers, but there is no other evidence to support the presence of drill holes.  The Rotational Molding report concludes that some of the returned barriers had been intentionally damaged, but there is no mention of drill holes in any of the barriers.  Indeed, the letter from Brian Brough suggests that "[m]ost likely, the barriers were damaged during transportation."  [Pl. Ex. 13.]  The record also contains testimony that the barriers were handled roughly by the Rotational Molding employees who were loading the barriers onto Safety Barriers's trucks, that the barriers were handled roughly by Safety Barriers's employees who were unloading the barriers, and that the barriers were handled roughly by National Guard personnel who were unloading barriers.  Based on this confusion in the record and the incredibility of Mr. Tourte's testimony, the Court cannot find a preponderance of the evidence shows that Safety Barriers, via Mr. Tourte, intentionally damaged the barriers.  On the whole, the Court finds that Traffic Safety has not shown an intentional misrepresentation of an existing material fact and therefore cannot establish a claim for fraud or intentional misrepresentation.  In light of this conclusion, Traffic Safety is not entitled to recover punitive damages.

C.    Damages – Traffic Safety

    1.    Unpaid Invoices

As discussed above, Traffic Safety should be compensated for the second and third shipments of barriers with appropriate reductions taken for the defective barriers.  Traffic Safety charged Safety Barriers $27,500.00 for the second shipment and $30,770.00 for the third shipment.  [Pl. Exs. 5,7.]  Traffic Safety initially issued a credit in the amount of $24,945.00 [Pl. Ex. 33] for the defective barriers, an amount that the Court finds reasonable and appropriate to compensate Safety Barriers for the defective barriers.  *Envirex, Inc.*, 454 F. Supp. at 1340.  Therefore, Traffic Safety is entitled to recover a total of $33,325.00 from Safety Barriers for the unpaid invoices.

    2.    Attorney Fees and Interest

Traffic Safety seeks attorneys fees and interest on the unpaid invoices based on the language printed on the invoices.  Safety Barriers argues that plaintiff is not entitled to an award of attorney fees based on the contract language.  [*See* Doc. 39 at 5, n.2.]  Safety Barriers also argues that interest and attorney fees are excluded pursuant to the terms of the contract.  Specifically, the contract provides in pertinent part as follows:

> The individual contracts for the sale of Products formed by Distributor's submission of orders to Supplier pursuant to the terms and conditions hereof shall automatically incorporate, to the extent applicable, the terms and conditions hereof, shall be subject only to those terms and conditions (together with all terms in orders which are contemplated by this Agreement) and shall not be subject to any conflicting or additional terms included in any documents exchanged in connection therewith.

[Pl. Ex. 1 at 4.]  Thus, Safety Barriers relies on the language that all orders "shall be subject only to those terms and conditions" of the contract and "shall not be subject to any conflicting or additional terms."

Traffic Safety's response to this argument seems to be that the interest and attorney fee language on the invoices is the parties' course of dealing and should therefore be incorporated into the agreement.  Traffic Safety relies upon 13 Pa. Cons. Stat. Ann. § 1205 which states in pertinent parts:

> (a) **Definition of course of dealing.**–A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. ...
> (c) **Effect on agreements.**–A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.
> (d) **Construction.**–The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other, but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

Comment 2 to this section states that "[c]ourse of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement.  However, the provisions of the Act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning."  Because the invoices generated by Traffic Safety were issued after the formation of and during performance of the contract, they cannot be considered "course of dealing."  *J.W.S. Delavau, Inc. v. Eastern America Transp. & Warehousing, Inc.*, 810 A.2d 672, 684 (Pa. Super. Ct. 2002).

The parties do not address whether the invoice language may be considered a "course of performance," a sequence of conduct between the parties subsequent to the formation of the contract during performance of the terms of the contract, which may be considered in interpreting a contract. *Id*. at 683-84; 13 Pa. Cons. Stat. Ann. § 2208(a). The Code provides that "[t]he express terms of the agreement and any such course of performance ... shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance ... ." 13 Pa. Cons. Stat. Ann. § 2208(b). Applying this provision in the present case, the invoice language is inconsistent with the contract provision that the terms and conditions of any order shall be subject only to the terms and conditions of the contract because the contract makes no mention of interest or attorney fees. However, the full contract provision is that orders "shall be subject only to those terms and conditions (*together with all terms in orders which are contemplated by this Agreement*)." [Pl. Ex. 1 at 4 (emphasis added).] This provision is ambiguous in that it could be interpreted as "all terms ... contemplated by this Agreement" or as "orders which are contemplated by this Agreement." Certainly, the parties contemplated that Safety Barriers would place orders for barriers. It is unclear whether the parties contemplated additional terms to the orders such as interest or attorney fees. Because this parenthetical provision of the contract is ambiguous, the Court will construe it against the drafter of the document, Traffic Safety. *J.W.S. Delavau, Inc.*, 810 A.2d at 682. Because no provision was made in the contract for attorney fees or interest, the Court agrees that Traffic Safety cannot recover interest or attorney fees based on the unpaid invoices.

### 3. Transportation of barriers

Traffic Safety next contends that it is entitled to recover incidental damages for the expenses incurred in transporting the defective barriers from Safety Barriers to Rotational Molding and the inspection costs assessed by Rotational Molding. Traffic Safety relies on 13 Pa. Cons. Stat. Ann. § 2710, which states:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the breach by the buyer, in connection with return or resale of the goods or otherwise resulting from the breach.

Safety Barriers argues that Traffic Safety is not entitled to any damages related to the rejected barriers because they were not merchantable. Because the Court agrees that Traffic Safety breached the implied warranty of merchantability, the Court agrees that Traffic Safety is not entitled to recover the expenses incurred in the transportation of those barriers to Utah and the testing of those barriers by Rotational Molding.

### 4. Trade Show Expenses

The next item of damages sought by Traffic Safety is the expenses incurred for staffing a booth at several trade shows. Traffic Safety relies on the contractual provision in which Safety Barriers agrees to "use its best efforts to distribute the Products and to fully develop the market for the Products within the Territory." [Pl. Ex. 1 at 2.] Traffic Safety also argues that Safety Barriers breached the parties' oral contracts to attend the trade shows and that Traffic Safety should recover the expenses incurred in reserving space for Safety Barriers at these events.

Safety Barriers argues that Traffic Safety is not entitled to such damages because some of the expenses were incurred prior to the parties' contract, which was effective May 31, 2002. Safety Barrier also notes that the contract did not require Safety Barriers's attendance at trade shows or conventions. Further, Safety Barriers argues that the trade shows occurred after it had provided notice of termination of contract and that Mr. Wasserstrom knew that Safety Barriers's representatives would not be attending the trade shows.

After reviewing the transcript, it appears that only Mr. Wasserstrom testified on this issue. Mr. Wasserstrom admitted that the contract does not require attendance at trade shows but that the parties agreed to it for marketing purposes. [Tr. at 139.] The Court finds that this scintilla of evidence is not sufficient to establish the existence of an oral contract for Safety Barriers to attend trade shows at Traffic Safety's expense. Accordingly, Traffic Safety is not entitled to recover expenses incurred for Safety Barriers's attendance at trade shows.

5. <u>Lost Profits</u>

Traffic Safety next seeks to recover lost profits for Safety Barriers's failure to purchase 3,000 barriers during the first year of the contract, or by May 31, 2003. Traffic Safety relies on section 2708(b) of the UCC on the seller's damages for nonacceptance or repudiation, which states as follows:

> (b) **Exception.**–If the measure of damages provided in subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable

overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this division..., due allowance for costs reasonably incurred, and due credit for payments or proceeds of resale.

13 Pa. Cons. Stat. Ann. § 2708(b).  Traffic Safety argues that its damages include the loss of bargain, or the value of its contract.

Safety Barriers argues that it properly terminated the contract after Traffic Safety supplied defective barriers and was unable to provide adequate assurances that it could provide merchantable barriers in the future.  Safety Barriers relies on the following provisions of the contract:

> Effects of Termination. ...In the event this Agreement is terminated ... by Distributor due to Supplier's breach, Distributor may, in its sole discretion, return, within ninety (30) [*sic*] days from the termination date, all Product then in its inventory and Supplier agrees to accept the return of such Product and fully refund amounts paid by Distributor for such Products.

> No Liability for Termination.  Neither party will be liable for damages of any kind as a result of exercising its right to terminate this Agreement according to its terms, and termination will not affect any other right or remedy at law or in equity of either party.

[Pl. Ex. 1 at 6.]

The Court has previously found that Safety Barriers prematurely terminated the contract following Traffic Safety's breach of the implied warranty of merchantability. Although lost profits may be recovered if (1) the damages are established with reasonable certainty, (2) the damages are the proximate consequence of the wrong, and (3) the damages are reasonably foreseeable, lost profits "cannot be recovered where they are merely speculative." *Brisbin*, 398 F.3d at 289 (quoting *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d

1243, 1258 (Pa. Super. Ct. 1983)).  Further, it appears that Pennsylvania courts are reluctant to award lost profits when a business venture is not well established.  *Id.*

The Court finds that the lost profits requested by Traffic Safety are speculative. Although the contract provided that Safety Barriers would purchase 3,000 barriers within the first year, Traffic Safety's record of supplying defective barriers within the first three shipments undercuts its argument that it would have made a profit on the 2,648 barriers yet to be sold.  Based on the problems that developed so early in this business relationship, it seems probable, despite Traffic Safety's guarantee to contrary, that any additional shipments of barriers would also have some level of defects.  In those instances, Traffic Safety would be replacing or providing a credit for defective barriers and thus would not be making any profit on the defective barriers.  Therefore, the Court finds that Traffic Safety is not entitled to an award of lost profits.

### 6.  Prejudgment Interest

Finally, Traffic Safety seeks an award of prejudgment interest.[11]  Safety Barriers does not directly respond to this request, presumably because of its position that Traffic Safety is not entitled to any recovery.  However, based on the Court's finding that Traffic Safety is entitled to recover the amounts owed on the two unpaid invoices, it appears that prejudgment interest is appropriate.  *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 395 (3rd Cir.

---

[11]In its post-trial brief, Traffic Safety asserts that it is entitled to prejudgment interest "on the lost profits damages"  [Doc. 159 at 39] without mention of prejudgment interest on the unpaid invoices.  Despite this omission, the Court nevertheless finds that an award of prejudgment interest as to the unpaid invoices is appropriate based on the unequivocal application of Pennsylvania law.

2000) ("where there has been a failure to pay a fixed or liquidated sum due on a certain date -- the party to whom the sum is owed may as a matter of right recover prejudgment interest at the legal rate of six percent running from the date the sum is due"); *Daset Mining Corp. v. Industrial Fuels Corp.*, 473 A.2d 584, 595 (Pa. Super. Ct. 1984) ("In contract cases, prejudgment interest is awardable as of right.").

The parties' contract states that payment is due "within fourth [*sic*] five (45) days after Distributor's receipt of that invoice." [Pl. Ex. 1 at 5.] The parties did not present any evidence as to when Safety Barriers received the invoices for the second and third shipments, nor whether the invoices were sent via regular mail, facsimile, or other transmission. Assuming that the invoices were mailed to Safety Barriers and further assuming a three-day period for the mail to be received at Safety Barriers, the invoice for the second shipment [Pl. Ex. 5] would have been received on or about June 30, 2002, and the invoice for the third shipment [Pl. Ex. 7] would have been received on or about July 11, 2002. Thus, payment on the second invoice was due on or about August 14, 2002, and payment on the third invoice was due on or about August 25, 2002. Safety Barriers is entitled to prejudgment interest at a rate of 6% on the unpaid invoices, less the credit applied for defective barriers, through the date of entry of judgment. 41 Pa. Cons. Stat. Ann. § 202 (the "legal rate of interest" "shall be construed to refer to the rate of interest of six per cent per annum"); *Alberici v. Safeguard Mut. Ins. Co.*, 664 A.2d 110, 115 (Pa. Super. Ct. 1995) ("In an action for breach of contract, the debtor is obligated to pay interest at the legal rate from the time payment has been withheld until the entry of a verdict. ...Regardless of the reason for delay, a court may not

suspend the accrual of pre-judgment interest during the period between trial and the entry of its verdict.").

D.      Damages – Safety Barriers

Safety Barriers, through its counterclaim, seeks damages in the amount of $11,419.70, for the inspection and shipping of the defective barriers.  [*See* Def. Ex. 30.]  Safety Barriers relies on 13 Pa. Cons. Stat. Ann. § 2715 which states in part as follows:

> (a)  **Incidental damages.**–Incidental damages resulting from the breach of the seller include:
> (1)  expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected;
> (2)  any commercially reasonable charges, expenses or commissions in connection with effecting cover; and
> (3)  any other reasonable expense incident to the delay or other breach.

Traffic Safety argues that Safety Barriers is not entitled to recover any damages based on the contract language that allows the seller the opportunity to cure after receiving notice of defective goods.  That provision, however, deals with when the buyer may terminate the contract.  [Pl. Ex. 1 at 6.]  The contract makes no mention of recovery of incidental damages for either party.  Traffic Safety also argues that Safety Barriers's claimed expenses are based on false pretenses.[12]

---

[12]Traffic Safety's post-trial brief also argues that Safety Barriers is not entitled to damages for lost profits or lost business opportunities.  [Doc. 159 at 46.]  The Court has found no indication that Safety Barriers has made such a request and therefore will not address it.

The record reflects that, after receiving notice that some of the barriers delivered to the National Guard were defective, Mr. Wasserstrom advised Mr. Davis to keep track of the expenses incurred in testing and replacing the barriers. Mr. Davis did so and sent Mr. Wasserstrom the itemization that is Defendant's Exhibit 30. Safety Barriers further advised Mr. Wasserstrom that it "would like to move forward and continue" if he agreed to the requested reimbursement. [Pl. Ex. 32.] Mr. Wasserstrom proposed to compensate Safety Barriers in the amount of $5,055.40 [*see* Pl. Ex. 12], after which Safety Barriers terminated the contract. Based on Mr. Davis's testimony, the Court agrees that some of the expenses requested are unnecessary and excessive. The Court finds that Traffic Safety's counterproposal of $5,055.40 is reasonable and would fairly compensate Safety Barriers for the incidental expenses incurred in inspecting and transporting the defective barriers.

## III.    Conclusion

For the reasons set forth herein, the Court finds that plaintiff Traffic Safety Devices, Inc. shall recover a total of $33,325.00 for breach of contract for unpaid invoices. Plaintiff shall also recover prejudgment interest in the amount of 6% per annum on $27,500.00 to run from August 14, 2002 to the entry of judgment, and on $5,825.00 to run from August 25, 2002 to the entry of judgment. The Court further finds that defendant Safety Barriers, Inc. shall recover $5,055.40 for incidental expenses incurred as a result of plaintiff's breach of the implied warranty of merchantability. The plaintiff's claims for fraud and punitive

damages are dismissed. The Clerk is directed to enter judgment accordingly and to close this

case.

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE